CHICAGO TEACHERS UNION, LOCAL NO. 1, AFT/AFL/CIO, a Voluntary Association Organized as a labor union, et al., Plaintiffs,

v.

Donald A. JOHNSON, Individually and as Director of Labor State of Illinois, et al., Defendants.

No. 76 C 2294.

United States District Court, N. D. Illinois, E. D.

Oct. 13, 1976.

Joseph Jacobs, Lawrence A. Poltrock, Wayne B. Giampietro, Chicago, Ill., for plaintiffs.

William J. Scott, Atty. Gen., State of Illinois, Samuel K. Skinner, U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

FLAUM, District Judge:

Before the court is the plaintiffs' motion for a preliminary injunction restraining the state defendants from refusing to process plaintiffs' applications for Special Unemployment Assistance [SUA] on the basis of an administrative determination that plaintiffs fall within the exclusion to eligibility delineated in 26 U.S.C. § 3304 note 210. The facts surrounding this action have been set forth in two previous opinions denying the plaintiffs' motion for a temporary restraining order and denying the defendants' motions to dismiss, and need not be repeated herein. The sole issue before the court on this motion for the preliminary injunction is the latitude to be accorded a state administrative agency in defining the phrase "the period between two successive academic years" without being in plain conflict with the federal eligibility standard.

The federal-state agreement governing the SUA program requires that eligibility determinations be made by the appropriate state administering agency consistent with state law. 26 U.S.C. § 3304 note 207. In Illinois, the appropriate agency is the Illinois Bureau of Employment Security Division of Unemployment Insurance, which determined that the Chicago School Board's academic year ended on June 7, 1976, three weeks prior to the scheduled school closing date of June 29, 1976. Plaintiffs applied for SUA benefits seeking payments for the three week period, and the Bureau determined that these teachers applied for benefits for "the period between successive academic years" and were ineligible under subsection 210. This court held an evidentiary hearing on September 10, 1976 to ascertain the basis of the Bureau's decision, as it had not previously been made a part of the record. At that hearing Mr. Kuczynski, the representative of the Illinois Bureau of Employment Security Division of Unemployment Insurance, testified regarding the components of the Bureau's decision of ineligibility. The critical factor relied upon by Mr. Kuczynski and the Bureau was the absence of a recall date for the teachers, indicating that school was officially closed and that the teachers would not be returning until the following school year. The Bureau reasoned that the absence of this recall date precluded a determination that the situation was an economic layoff within the ordinary meaning of the term. The Bureau also considered the fact that the school children received full academic credit for completing an entire school year. Mr. Kuczynski testified that the Bureau was cognizant of the state statute imposing a monetary penalty for school closing prior to completion of a specified number of days [Ill.Rev.Stat. ch. 122 § 34–18 (1975)], the official calendar and the Rules and Regulations of the Chicago Board of Education, and the provisions of the collective bargaining agreement between the teachers and the Board, however, these factors were not considered to be controlling in the determination of "academic years." Implicit in any such determination by the Bureau would be

recognition of the following factors: the monetary penalty statute is distinct from any definition of an academic year; the official calendar presented by the Chicago Board is adopted as a city ordinance subject to amendment to reflect alterations of pertinent dates; the Rules and Regulations are also subject to amendment; and, the collective bargaining agreement reflects the contractual arrangement of the Board and teachers without specifically defining the academic year. While Mr. Kuczynski did not isolate a single factor as dispositive his testimony indicated that the Bureau relied on the absence of recall date and the credit awarded the school children for completion of the 1975–76 academic year. Quite simply, the Bureau determined that the early closing was permissible under state law, that it was final and irrevocable as there was no recall date, thus the academic year was terminated and the teacher applicants were "between successive academic years".

The CTU challenges the Bureau determination in a two count complaint which sets forth the classic welfare rights claims. *See e. g., King v. Smith,* 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Count I, the "statutory claim", asserts that the Bureau determination contravenes the applicable federal statute; count II, the due process claim, asserts that the Bureau determination was arbitrary and capricious, without reasonable basis, thus violative of federally guaranteed rights. It should be noted that the plaintiffs in this action challenge an ad hoc administrative determination not an official regulation promulgated by a state agency or department. *King v. Smith, supra; Rosado v. Wyman, supra.* Yet the effect of the administrative determination is to foreclose eligibility for 26,000 teachers and to, in effect, establish a regulation that certain year-end early closings by the Chicago School Board will not entitle teachers to SUA benefits. Thus any distinction between the challenged Bureau determination and a duly promulgated department regulation is a distinction without a difference to these plaintiffs.

The theory of the plaintiffs' first count, the statutory claim, is that "a state program which restricts eligibility beyond what was intended by Congress is invalid for inconsistency with" the federal Act. *Mandley v. Trainor,* 523 F.2d 415, 420 (7th Cir. 1975). The approach formulated by the Supreme Court focuses on the federal statute and the state restriction to determine if they are in plain conflict. *Smith v. King,* 392 U.S. at 326, 88 S.Ct. 2128. Thus the analysis for resolving this statutory claim must juxtapose the federal statute and the Bureau determination to assess whether the determination plainly conflicts with the intended coverage of the federal scheme.

In the instant case, the plaintiffs argue that the Bureau determination of ineligibility is in plain conflict with certain factors for evaluation set forth in a telegram dated June 9, 1976 from the U.S. Department of Labor in response to the state defendants' inquiry regarding plaintiffs' eligibility under the federal Act. [Exhibit C, Plaintiffs' Complaint]. The telegram directs the state defendants to examine state and local law, the collective bargaining agreement and the effect of early closing in determining whether the closing was "in fact and in law prior to the end of the school year." The plaintiffs assert that the Bureau decision of ineligibility cannot reasonably be based on these factors, as their evaluation of these factors prompts the opposite conclusion. While the court finds this analysis pertinent to the due process claim asserted in count II (not currently under consideration), it is not the correct inquiry for resolution of the statutory claim. The telegram is not binding, it is without the force of law. It may be characterized as purely advisory, a directive of the United States Department of Labor for a common sense approach to the eligibility question addressing areas of investigation which should have been pertinent to the administrative determination. Failure to comply with these directions, if proven, may well be evidence of the alleged due process violation, but that failure is not the proper

basis for finding a statutory violation.[1] To adopt the plaintiffs' approach, juxtaposing the Bureau determination with the directions in the June 9 telegram, distorts the statutory claim analysis which tests the challenged state action against the language and intent of the federal statute. Thus count I of the plaintiff's complaint requires an analysis of the congressional scheme and the legislative history of the federal statute to ascertain whether the Bureau interpretation of "academic years" which precludes plaintiffs from eligibility is in conflict with the intent of Congress.

■ The stated purpose of the SUA program is to provide benefits for workers who are unemployed during a period of aggravated unemployment. [26 U.S.C. § 3304 note 210]. The SUA program and the Emergency Unemployment Compensation Act of 1974 which it amends tie the availability of federal funds to "emergency on" indicators which are based on the prevailing rate of insured unemployment in the given state. The programs provide assistance for long term unemployed persons who have exhausted available state unemployment compensation benefits. Certain provisions of the program predicate payment of benefits to acquisition of further job training to increase the re-employment potential of the recipient. The very nature of the compensation scheme, its extended duration and integral relation to prevailing economic factors, anticipates sustaining an unemployed worker during the search for re-employment in a locale marked by chronic unemployment and a depressed job market.

■ This overview of the general congressional scheme must be read against the backdrop of the legislative history of the exclusion of subsection 210. "As is often the case, the legislative history . . . contains little information helpful as to Congressional intent." *Mandley v. Trainor,* 523 F.2d at 421. A review of the legislative history indicates that the early closing issue

presented in this action was not contemplated in the hearings or committee meetings. The complete absence of any allusion to the possibility of many thousands of applications for benefits because of an early closing raises an inference that Congress never anticipated the use of SUA as a subsidy to floundering school boards to guarantee the obligations of the collective bargaining agreement. It appears that the specific problem addressed in the subsection 210 exclusion is to preclude teachers from recovering benefits during the summer months when school is not in session. The legislative history notes that in the absence of this prohibition, "a number of states have indicated that they find no provision in their laws by which they can deny emergency assistance to professional educational workers who are only temporarily unemployed during this period." S.Rep.No.208, 94th Cong., 1st Sess. 5–6 (1975), U.S.Code Cong. & Admin.News 1975, pp. 377, 382.

■ The approach of Congress can fairly be characterized as restrictive, for in referring to the subsection 210 exclusion the Senate Report recognized that it will "prohibit the states that may pay these benefits from doing so. It is to be noted that these benefits are financed 100 per cent from federal funds." S.Rep.No.137, 94th Cong., 1st Sess. 33 (1975). Undoubtedly the situation envisioned by Congress was a teacher who is "totally out of work and desperately looking for [a] job[s]" in a market overloaded with professional educators. Hearings on HR 5899 before the Subcommittee on Unemployment Compensation of the Committee on Ways and Means, 94th Cong., 1st Sess. 194 (1975). In fact representatives of the National Education Association indicated that as teachers are generally employed on a yearly basis from August to September of the following year, the period for receipt of benefits does not commence in some states until the school term resumes, the contract has expired and the teacher is truly unemployed.[2] Certainly,

---

1. In conformity with traditional principles of constitutional law, review of the due process claim is deferred pending resolution of the plaintiff's statutory claim. *See, e.g., Rosado v. Wyman, supra.*

2. Hearings on HR 5899 before Subcommittee on Unemployment Compensation of the Committee on Ways and Means, 94th Cong., 1st Sess. 201 (1975). [Statement of James Harris, President of the National Education Association].

these statements cannot be read as a congressional intent that no benefits can be paid to teachers under contract. However, it is indicative of an underlying assumption that teachers with contracts for the term prior to the summer hiatus and for the term following it are not in fact unemployed. Thus a hypothetical teacher placed on economic layoff for the remaining school year who is without a contract for the subsequent academic year is truly unemployed. That teacher faces the risks of re-training or relocation inherent in the restricted job market. The extended benefits of SUA may well be necessary in this emergency situation to sustain the teacher until further employment can be found. In the instant case, 26,000 teachers employed under contract[3] and returning to employment under contract, expected to work until June 29, 1976 and because of the early closing they were able to work only until June 7, 1976. The teaching contracts were not revoked, and these teachers did not have to seek other employment because their future employment was secure. Accordingly, on the evidence presented the court finds that the situation of the plaintiff applicants falls outside the ascertainable federal intent of sustaining unemployed workers seeking new employment.

The court recognizes that these teachers expected to work through June 29, 1976, bargained to work during those weeks, and have not been paid for those weeks. A compelling argument can be structured that despite the operative contract and the guarantee of another contract at the end of the summer, these teachers were without income and were as unemployed as a clerk or factory worker without a contract on economic lay-off. But the critical issue is not whether this court perceives payment of SUA benefits to these teachers as reasonable or permissible. On the contrary, the issue is whether, having authorized the state agency to make the necessary eligibility determinations consistent with state law,

the Bureau determination in this case is in plain conflict with the ascertainable legislative intent. After this preliminary review of the legislative history, the court is persuaded that it is not.

This decision that the Bureau may permissibly define "between academic years" on the basis of the actual rather than the projected completion of the school term rests on several factors. First, the congressional scheme of the Special Unemployment Assistance Program is to sustain workers in fact unemployed whose search for re-employment is prolonged by depressed economic conditions. Secondly, the legislative history is silent as to coverage in this situation, and it may be inferred that mass subsidy to state school boards was never contemplated by Congress. Thirdly, in the face of this statutory scheme for sustaining long term unemployed persons and the silent legislative history, this court cannot simply presume plaintiff's eligibility in the absence of an express definition of the scope of coverage. *Burns v. Alcala,* 420 U.S. 529, 95 S.Ct. 1180, 43 L.Ed.2d 373 (1975). Lastly, on a motion for a preliminary injunction the plaintiffs have the burden of establishing some likelihood of success on the merits. The evidentiary hearing in this cause did not reallocate this burden and plaintiffs have simply failed to demonstrate that the Bureau determination is in conflict with the federal eligibility standard.

The issue of the latitude to be allowed an administrative agency in determining the eligibility of teacher applicants for SUA when school districts close prematurely was briefed in haste and argued on emergency status. Whatever emergency may have allegedly been present is long past, and the high cost of education with the concomitant problems of school funding frames a significant and recurring problem of statutory interpretation which must be carefully evaluated by this court. The parties have misconceived the gravamen of the statutory

**3.** The issue of the teacher's contractual remedy is not before this court and it is not an element of this analysis.

claim and have failed to address the issue of the legislative language and intent. While the court has examined these areas to provide an expeditious ruling on the motion for the preliminary injunction, the analysis of the legislative language and history in this opinion is not intended to foreclose the opportunity of further briefing by the parties. As the court perceives it, the facts surrounding count I are not in dispute and the case is in a posture suitable for resolution by motions in which the parties may address the issue of congressional intent.

In conclusion, the plaintiffs' motion for a preliminary injunction must be denied as plaintiffs have failed to meet the burden on the movant for such extraordinary relief. The plaintiffs were unable to establish any irreparable injury in the request for the temporary restraining order in June of 1976, and since that time the teachers have returned to work and irreparable injury cannot seriously be argued. In the light of the legislative language and intent the court finds that plaintiffs have failed to establish a likelihood of success on the merits of the statutory claim. Accordingly, the motion for preliminary injunction is hereby DENIED.